387 So.2d 548 (1980)
PROFESSIONAL LENS PLAN, INC., a Kansas Corporation, Appellant,
v.
DEPARTMENT OF INSURANCE, STATE OF FLORIDA, Appellee.
No. PP-244.
District Court of Appeal of Florida, First District.
September 10, 1980.
*549 Frederick M. Bryant and Everett P. Anderson of Pennington, Wilkinson, Gary & Dunlap, Tallahassee, for appellant.
Donald A. Dowdell, Tallahassee, for appellee.
LARRY G. SMITH, Judge.
Professional Lens Plan, Inc. appeals a declaratory statement issued by the Department of Insurance holding that the Company's offering of its Professional Lens Plan (PLP) in Florida would be subject to regulation as "insurance" under the Florida Insurance Code (Chapters 624-632, Florida Statutes), or, if not insurance, that the operation of the plan in Florida would be prohibited by Part I of Chapter 637, Florida Statutes. Appellant contends basically that its plan, under which participating optometrists agree to furnish replacement contact lenses to their patients for an annual fee plus a fixed sum representing costs of the lenses, is simply a purchase arrangement, not insurance; and further, that Chapter 637 does not apply because appellant does not contract with the patient for the furnishing of "optometric service or care" as contemplated by the statute. Based upon these and other contentions which will be more fully discussed, we reverse.
The essential details of the plan can be extracted from the hearing officer's carefully drawn order which was adopted by the Department. Optometrists desiring to participate in PLP are furnished application forms and related materials. The optometrists' patients who desire to participate in the plan complete an application which is forwarded to Professional either by the patient or the optometrist, together with an annual fee which is set by the optometrist. These fees, at the time of the hearing, averaged approximately $21.00; however, Professional exercises no control over the size of the annual fee set by each optometrist. Upon receipt of the application, Professional completes the patient's copy and the optometrist's copy, and returns copies to the respective parties. Professional deducts an amount from the annual fee paid by the patient as consideration for its furnishing the optometrist with agreement forms, information, brochures, annual patient notification and other administrative functions. Professional's usual deduction was $6.00 or, for optometrists who submitted a large number of patient applications, $4.00.
Under the agreement between the optometrist and the patient, in consideration of payment of the annual fee and payment of an agreed dispensing fee for each lens, the patient is allowed to obtain as many lenses during the year as he desires, either because of loss or damage to his contact lenses, or by reason of a prescription change, or any other reason, such as the desire for an extra set or sets, or for cosmetic reasons, such as change in color. The dispensing fee, which is not subject to change during the year covered by the agreement, is set by the individual optometrist and in most instances is an amount equal to or slightly above the cost of the lens to the optometrist, which is generally about 50% of the retail cost of the lens. Professional has no control over the amount of the dispensing fee charged by the optometrist, and it does not receive any part of the sums paid by patients as dispensing fees. Under the agreement, the patient *550 must pay the optometrist for any needed eye examinations, and no part of these examination fees are paid to Professional.
The agreement between the optometrist and Professional provides for Professional to notify each patient when it is time for an annual eye examination, and to remind him to make an appointment. Professional also agrees to provide patients with renewal applications. If the patient desires to continue the agreement for another year, the dispensing fee is again set by the optometrist, the patient pays the annual fee, application is forwarded to Professional, and the same process as above described is repeated.
Under the hearing officer's interpretation of the testimony, only in a relatively small percentage of cases are replacement lenses provided for other than the fortuitous reasons of loss, damage or prescription change. He concluded that since the primary object of the agreement is to secure and provide protection against the cost of securing replacement lenses as a result of loss, damage or prescription change, the contract is one of indemnity, and must be treated as a contract of insurance, citing State v. DeWitt C. Jones Co., 147 So. 230 (Fla. 1933); Guaranteed Warranty Corp., Inc. v. State ex rel. Humphrey, 23 Ariz. App. 327, 533 P.2d 87 (1975); Jordan v. Group Health Assoc., 107 F.2d 239 (D.C. Cir.1934); Attorney General Opinion 055-225 (Fla. 1955). He found similarities between the plan and contact lens insurance programs presently offered in the state, except, however, the insurance plans do not provide for replacement of lenses for any reason desired by the patient, but provide only for indemnity against loss or damage beyond repair.
Florida Statutes, Section 624.02 (1979), defines "insurance" as follows:
"Insurance" is a contract whereby one undertakes to indemnify another or pay or allow a specified amount or a determinable benefit upon determinable contingencies.
Going beyond this abbreviated statutory definition, the court in Guaranteed Warranty Corp. v. Humphrey, supra, cited by both parties, stated that five elements are normally present in an insurance contract, which are (533 P.2d at 90):
1. An insurable interest.
2. A risk of loss.
3. An assumption of the risk by the insuror.
4. A general scheme to distribute the loss among the larger group of persons bearing similar risks.
5. The payment of a premium for the assumption of risk.
The parties obviously disagree upon application of these definitions. Our analysis begins with the recognition that a patient may obviously have an "insurable interest" in his contact lenses. Admittedly there is a "risk of loss" of his lenses. It must also be recognized, however, that the contract provides terms upon which lenses may be purchased entirely apart from any question of "insurable interest," or loss or damage to the patient's existing lenses. Even if it is conceded, as the Department argues, that the "primary object" of the agreement is to provide for replacement of lost or damaged lenses, we cannot agree that the PLP is thereby transformed into a contract of insurance. The contractual arrangement is lacking in the other elements, viz, assumption of risk by the insurer, distribution of a loss, and payment of a premium for assumption of a risk-the "contract ... to indemnify" aspect of the statute (Section 624.02).
As between Professional and the patient, there is no contractual obligation or duty. This determination alone would, in our opinion, dispose of the contention that Professional is engaging in a business of "insurance." Evidence was presented to the hearing examiner indicating that thirty-seven other states have determined that Professional is not engaged in the business of insurance. Furthermore, the contract between the optometrist and his patient is not one of indemnity, but rather, it is one providing for the purchase of additional or replacement contact lenses by a patient. Neither Professional nor the optometrist suffers any "loss" by virtue of a patient's exercise of his option, under the contract, to *551 purchase as many additional sets of lenses as he desires. We find a perhaps inadvertent acceptance of this reasoning in the legal memorandum submitted by the Department's counsel in the proceeding below, in which appears the following:
Even though the PLP plan operates to dramatically reduce a patient's loss in the event he needs new lenses, it does not eliminate his costs altogether. He must still pay for the actual cost of the lenses. (emphasis supplied)
There is no "distribution of loss" under this arrangement, no is there payment of a "premium," since no part of the annual fee paid by the patient is utilized in paying the cost of the replacement lenses. The annual fee paid by each patient resembles more closely a consideration paid for an option to purchase lenses at a fixed price, and can reasonably be considered in part as compensation to the optometrist for the service provided in explaining the plan, assisting in filling out forms, etc., although, as disclosed by the testimony, some participating optometrists retain no portion of the application fee whatsoever. We find nothing in the facts nor in the law stated in State v. DeWitt C. Jones Co., supra, which would indicate a result contrary to one we reach here.
We find no merit in the contention that Professional's PLP plan is subject to regulation under Chapter 637, dealing with "Nonprofit Optometric Service Plan Corporations." Professional does not bind itself in any way to provide "optometric service or care" to the public, so as to bring it within the purview of this statute. We agree with appellant that Professional's role is to provide services to the optometrist, consisting of the furnishing of forms, renewal and re-examination notices, and like administrative functions. Service contracts of this type, referred to in the trade as "provider agreements," do not constitute the business of insurance. See Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). Moreover, we find nothing in this statute which purports to limit or restrict an optometrist in his relations with his individual patients, in which he agrees to furnish replacement lenses at an agreed upon price.
While we have determined that the PLP plan does not constitute the business of "insurance" so as to warrant regulations under the Florida Insurance Code, we express no opinion concerning the effect of any other law or regulations purporting to govern the practice of optometry in this state.
The order appealed is REVERSED.
SHAW, J., and LILES, WOODIE A. (Ret.), Associate Judge, concur.